# LOCAL OFFICIAL FORM NO. 8

_____DEBTOR_____'s **WITNESS AND EXHIBIT RECORD**

| Date | Case or Adv. Pro. No. | Operator* | Page Number |
|------|----------------------|-----------|-------------|
| Name of Witness | Brief Description of Testimony to be Elicited | Estimated Time to Elicit Testimony | Date Called* |
| Jaspreet Attariwala | Authentication of documents | 5 mins. | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |

*For Court Use

Page 1 of  2

| Exhibit Number* | Description | ID* | Date Admitted* |
|---|---|---|---|
| 1 | Chase money market statement | | |
| 2 | Magistrate's Order | | |
| 3 | Excerpt of transcript from deposition of 3/11/20 | | |
| 4 | Singota motion Exhibit B | | |
| 5 | Indiana Court Order entered 2/1/2022 | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |

*For Court Use

Page___of _____

---

# Exhibit 1

Chase #6232 Statement

# J.P.Morgan

Statement Period

**November 30 - December 31, 2019**

Last Statement: November 29, 2019

Account Number

██████ **6232**

Account Value With Accruals: **$0.00**

**JASPREET K ATTARIWALA TOD**
1390 KENYON ST NW APT 323
WASHINGTON DC  20010-7222

## Account Activity Summary

**TFR ON DEATH IND**

Not Actively Managed

| Description | This Period | Year-to-Date |
|---|---|---|
| Beginning Account Value | $12,194.24 | $28,653.10 |
| Deposits (Cash & Securities) | 14.05 | 14.05 |
| Withdrawals (Cash & Securities) | (12,200.37) | (32,200.37) |
| **Net Deposits / Withdrawals** | **($12,186.32)** | **($32,186.32)** |
| Income | 7.58 | 405.80 |
| Fees 1 | (15.50) | (330.58) |
| Change in Investment Value | 0.00 | 3,458.00 |
| **ENDING ACCOUNT VALUE** | **$0.00** | **$0.00** |
| Net Accrued Income | 0.00 | 0.00 |
| **Account Value With Accruals** | **$0.00** | **$0.00** |

1 *Account fees, management fees, and debit interest are included. Trade related fees charged by brokers and commissions impact the total cost or proceeds of your trades and are not included here.*



**Account Value with Accruals**
(January 2018 to December 2019)

Month End Closing Method: First In, First Out (FIFO)

Your Broker/Dealer is  J.P. MORGAN SECURITIES LLC, 4 Chase Metrotech Center, Brooklyn, New York 11245-0001

INVESTMENT AND INSURANCE PRODUCTS ARE: • NOT FDIC INSURED  • NOT INSURED BY ANY FEDERAL GOVERNMENT AGENCY
• NOT A DEPOSIT OR OTHER OBLIGATION OF, OR GUARANTEED BY, JPMORGAN CHASE BANK, N.A. OR ANY OF ITS AFFILIATES
• SUBJECT TO INVESTMENT RISKS, INCLUDING POSSIBLE LOSS OF THE PRINCIPAL AMOUNT INVESTED

*Page  7 of 68*

Investment products and services are offered through **J.P. Morgan Securities LLC** (JPMS), a registered broker-dealer and investment advisor, member of FINRA and SIPC. Annuities are made available through Chase Insurance Agency, Inc. (CIA), a licensed insurance agency, doing business as Chase Insurance Agency Services, Inc. in Florida. JPMS, CIA and JPMorgan Chase Bank, N.A. are affiliated companies under the common control of JPMorgan Chase & Co. Products not available in all states. For information about your account, please refer to your official JPMS account statement **which should not be used for tax reporting purposes**. Please read the important disclosures at the end of the statement. For questions, please call (888) 994 5626.

Attariwala - Chase money market 6232 - 1471

| STATEMENT SUMMARY | MANAGED | RETIREMENT MANAGED | IMPORTANT INFORMATION |
|---|---|---|---|

# Exhibit 2

Indiana Magistrate Judge's Order Entered Nov. 30, 2021

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | | |
|---|---|---|
| BIOCONVERGENCE LLC, *d/b/a Singota Solutions*, | ) ) ) | |
| *Plaintiff*, | ) ) | |
| vs. | ) ) | 1:19-cv-1745-SEB-MG |
| JASPREET ATTARIWALA, | ) ) ) | |
| *Defendant*. | ) ) | |

## **ORDER**

Pending before the Court in this breach-of-contract and trade secrets case brought by Plaintiff BioConvergence LLC, doing business as Singota Solutions ("Singota"), against its former employee, *pro se* Defendant Jaspreet Attariwala is a Motion to be Released as an Officer of the Court and for Distribution of Electronically Stored Information filed by the ESI Team, an interested party in this action, and its proprietor, Rebecca Green. [Filing No. 271.]

## **I.**
### **BACKGROUND**

As recounted in the Court's prior Order, [Filing No. 293], Ms. Green's company—the ESI Team—asks to be released from its appointment as an officer of the Court. To evaluate the ESI Team's request and to determine the disposition of the property and data held by the ESI Team, the Court ordered the ESI Team to file a certification with this Court identifying (a) the tasks it completed pursuant to the Inspection Order, [*see* Filing No. 85-7], (b) whether and what Singota information has been removed from Ms. Attariwala's accounts and devices, and (c) the copies of data and images of devices in its possession. [Filing No. 293 at 5-6.] The ESI Team filed its certification on September 14, 2021. [Filing No. 297; Filing No. 298.]

The parties then began a flurry of filings.  Singota filed a 35-page "Response to the ESI Team's Certification" (the "Singota Response"), with no fewer than 423 pages of exhibits.  [Filing No. 299.]  The Singota Response prompted a 5-page reply from the ESI Team, [Filing No. 300], and Ms. Attariwala submitted a 20-page brief with 30 pages of exhibits purporting to respond to the ESI Team's Certification, the Singota Response,[1] and the ESI Team's reply (the "Attariwala Response").  [Filing No. 304.]

## A.    The Inspection Order

Taking a step back, the Inspection Order entered by the state court on March 4, 2019 ordered that Ms. Attariwala "and anyone acting in concert or participation with her" turn over to Ms. Green "any and all personal computers, hard drives, or other electronic storage devices and media devices, including servers, email accounts, cloud accounts, cell phones, smart phones, and tablets, used to store electronic information in her possession, custody or control, including, but not limited to, all computers, devices, accounts, and media identified by Ms. Green pursuant to her analysis of Ms. Attariwala's electronic storage media."   [Filing No. 85-7 at 3.]  The Inspection Order then appointed Ms. Green and the ESI Team, "acting as an officer of the court," to "conduct an inspection of these devices, media, accounts, and computers," pursuant to the protocol set forth in the Order.  [Filing No. 85-7 at 3.]  The Inspection Order was agreed to and signed by counsel for both parties.  [Filing No. 85-7 at 9.]

---

[1] Singota has filed a Motion to Strike the Attariwala Response, [Filing No. 305], wherein Singota correctly notes that the Attariwala Response seeks "various types of relief" rather than merely responding to the ESI Team's Certification and the Singota Response.  As has become commonplace among the parties in these proceedings, Singota also disputes Ms. Attariwala's characterization of facts and proceedings (as Ms. Attariwala does Singota's recitation). Nevertheless, the Court is able to discern the issues properly before it, and further, Singota took the opportunity to make its own record responding to the Attariwala Response in its Motion to Strike.  Therefore, the Court will **DENY** Singota's Motion.

Generally, the tasks to be completed by ESI Team once Ms. Attariwala produced devices,

accounts, and data as required by the Inspection Order are as follows:

- First, the ESI Team was to preserve the electronically stored information gathered from Ms. Attariwala by imaging the information.  The originals were to be sealed and stored by the ESI Team. [Filing No. 85-7 at 5-6 (devices); Filing No. 85-7 at 6-7 (accounts).]

- Second, the ESI Team would then "process" the copies of the electronically stored information to enable certain functionalities, such as key word searching.  [Filing No. 85-7 at 6.]

- Third, the ESI Team would then conduct an "examination" by applying "[s]earch criteria" to "identify potentially responsive" electronically stored information.  [Filing No. 85-7 at 7.]  Ms. Green was to analyze the information for "[t]he presence of Singota information"; "[t]he access of Singota information"; [t]he transfer of Singota data to another device or storage location, including a personal computer, or another portable device or media such as USB drive, CD, DVD, etc."; [f]orwarding of Singota information to another party via email or some other electronic transfer means"; "[p]rinting of Singota information which would make the information now portable via paper"; and "[t]he deletion of information." [Filing No. 85-7 at 7.]

- Fourth, if the analysis located Singota information, Ms. Green was to "make a recommendation for removing the [electronically stored information] from [Ms. Attariwala's] devices or accounts," and all parties were to agree to the recommendation before removal.  [Filing No. 85-7 at 7.]  If a deletion was detected, Ms. Green was to "provide a report to the parties regarding same."  [Filing No. 85-7 at 7.]

- Fifth, Ms. Green was to "provide a list of files identified as potentially responsive to both parties' counsel…," but before sharing this list with Singota's counsel, Ms. Green was to first share the list with Ms. Attariwala's counsel who had three days to review the listed files for "personal information" that should not be shared with Singota's counsel.  Ms. Green's counsel was then to create a log for such documents.  [Filing No. 85-7 at 8.]

- Sixth, "[a]t some future date when the agreement between these parties has been fulfilled," the ESI Team would delete the original, control, and analysis copies.  [Filing No. 85-7 at 8.]

Before the ESI Team could complete these steps, it needed Ms. Attariwala to hand over

the electronically stored information as she was required to do by the Inspection Order.  To that

end, the Inspection Order directed Ms. Attariwala to "make available for inspection any and all

Storage Locations,[2] including all Accounts and Devices used to store electronic information in her possession, custody or control, including, but not limited to, all computers and devices which may contain ESI relevant in the matter or was connected to a personal computer or device which is known to contain ESI responsive in this matter." [Filing No. 85-7 at 4.] The Order further required Ms. Attariwala to take all efforts "to identify the Storage Locations which may be storing [electronically stored information] responsive to the matter." [Filing No. 85-7 at 4.]

**B.    Funding of the ESI Team's Work**

On March 18, 2019, the state court entered an order (the "Expenses Order") stating that Ms. Attariwala "is responsible for Ms. Green's costs for Phase I of Ms. Green's work." [Filing No. 85-8 at 3.] The Expenses Order defined "Phase I" as work by Ms. Green to "identify, collect and review computers and other electronic storage devices and accounts from [Ms. Attariwala] for inspection and, if necessary remove or delete [Singota's] confidential information from those devices or accounts, in addition to other work incidental to these tasks." [Filing No. 85-8 at 2.] Pursuant to the state court's order, Ms. Attariwala paid Ms. Green a $5,000 retainer in March 2019. Ms. Green quickly exhausted this retainer.

Ms. Green, who was charging Ms. Attariwala roughly $500 per hour, then recommended that Ms. Attariwala replenish the retainer with a $15,000 payment. [*See* Filing No. 4-1 at 232.] On April 16, 2019, the state court issued a show cause order requiring Ms. Attariwala pay Ms. Green an additional retainer of $15,000 within 24 hours. [Filing No. 85-9.] When Ms. Attariwala failed to pay the $15,000 within 24 hours, the state court held another hearing in which it found

---

[2] While the Inspection Order does not define "Storage Locations," the term "ESI Storage Locations" is defined as "the personal computer(s), hard drives, flash drives, thumb drives, any and all other devices and media used to store electronic information and all storage locations, such as email, cloud storage locations, and any service where electronic information can be stored, produced by Defendant." [Filing No. 85-7 at 3.]

4

her in contempt and stated on the record that it would order Ms. Attariwala to pay the $15,000 retainer, plus $10,000 a week, "[s]o for the first month it would be Fifty-five Thousand Dollars ($55,000.00) dollars." [Filing No. 85-10 at 12.] Ms. Attariwala's counsel told the state court that "I can tell you it's my understanding Miss Attariwala doesn't have that kind of money." [Filing No. 85-10 at 12.] Ms. Attariwala has never paid the $15,000 or the $55,000. Ms. Attariwala then removed the case to this Court on April 30, 2019. [Filing No. 1.] During this Court's December 4, 2019 hearing on Singota's Motion for a Further Preliminary Injunction, the Court and Ms. Attariwala's then-counsel had the following exchange:

THE COURT: … Mr. Jefferson? Why wasn't the $55,000 posted?

MR. JEFFERSON: She can't afford it.

THE COURT: Oh, did you tell that to the court?

MR. JEFFERSON: Not yet, Your Honor.

THE COURT: Wasn't the gist of that order that the 55,000 -- I mean the Court didn't say pay -- put up $55,000 if you can afford it, right? There was no request for relief from that, right? She's clearly in default of that, right?

MR. JEFFERSON: Yes, Your Honor, in terms of the expenses --

[Filing No. 155, 12/4/19 Hr'g Tr. at 46.]

On December 17, 2019, Ms. Attariwala filed a Chapter 13 petition for bankruptcy in the Bankruptcy Court for the District of Columbia. *In re Jaspreet Kaur Attariwala*, Case No. 19-00828-ELG (Bankr. D.C.). [Filing No. 123.] That petition remains pending, although the automatic stay has been lifted with respect to Singota's claims against Ms. Attariwala in this case. [Filing No. 213.] Ms. Attariwala's counsel withdrew from this case in February 2020, and since that time, Ms. Attariwala has proceeded *pro se*.

After Ms. Attariwala stopped paying, neither Singota nor the ESI Team asked this Court
to enforce the Expenses Order. [*See* Filing No. 292 at 18.]  Instead, Singota elected to start paying
the ESI Team to perform certain work on the devices and accounts collected from Ms. Attariwala.
[Filing No. 299 at 2.]  Singota says that between March 2019 and December 2019 it paid Ms.
Green "over $160,000 to identify Singota Data that Ms. Attariwala had taken and to identify
accounts and devices Ms. Attariwala had concealed from Green." [Filing No. 299 at 2.]  Singota
says it "paid most of these fees as advances of fees that are Ms. Attariwala's obligation under the
Expenses Order." [Filing No. 299 at 14.]  Singota further states that it "made clear to [Ms.] Green
that she should bill Singota for performing activities that it requests." [Filing No. 299 at 16.]

Ms. Green certifies that Singota has not funded any work since December 2019, so she has
not been performing work related to this case since that time.  [Filing No. 297 at 7.]

**C.    The ESI Team's Certification**

In its Certification, [Filing No. 297], the ESI Team reports that it has completed minimal
work under the Inspection Order.  During this case, Ms. Attariwala has produced the following
accounts and devices for inspection, with an indication of whether the ESI Team has made a copy.

| Account/ Device | Description | Serial Number | Copy/Image Made? |
|---|---|---|---|
| Device | Microsoft Surface | 054730284453 | Yes |
| Device | Apple iPhone | F18SP0LWHG70 | No[3] |
| Device | SanDisk Cruzer Switch USB Device | BI130824450B | Yes |
| Device | Seagate External USB Drive | NA77PYWY | Yes |
| Device | Singota labeled USB Device | None Printed Externally | Yes |

[3] The ESI Team says that this iPhone was imaged in early 2019 using Blacklight software, but the
ESI Team has not renewed its license for this software, so Ms. Green is unsure if the 2019 copy is
accessible.

6

| Device | Apple iPad | DMPHLAV60VD3 | No |
|--------|-----------|--------------|-----|
| Device | Apple MacBook | CO2RW29KG8WP | Yes |
| Device | Sony Vaio laptop | 545816300002787 | Yes |
| Device | BioConvergence USB Device | None Printed Externally | Yes |
| Device | Bio Convergence USB Device | None Printed Externally | Yes |
| Device | Life Sciences USB Device | None Printed Externally | Yes |
| Device | SanDisk USB Device 4 GB | BH1011OHUN | Yes |
| Device | SanDisk USB Device 8 GB | BI0904NVPB | Yes |
| Device | DataTraveler USB Device | None Printed Externally | Yes |
| Device | One Western Digital My Passport | WXB1E2582CKM | No |
| Device | Apple iPhone | F2NJR20RF8H4 | No |
| Device | SanDisk Cruzer | BN18052624BJ | No |
| Device | BioSpectra | None Printed Externally | No |
| Device | LifeSciences Labeled USB Device (scratched out with Songs written on it) | None Printed Externally | No |
| Account | Google Archive | Jsaini1@gmail.com | Yes |
| Account | Google Archive | simandjessie@gmail.com | Yes |
| Account | Google Archive | info@honeyji.com | Yes |
| Account | Email Collection | Jsaini1@hotmail.com | Yes |

[Filing No. 297 at 9.] Ms. Green says that in addition to making the copies as indicated above, she "forensically process[ed]" the Apple MacBook and an iPhone (though she does not specify which one), "including conducting searches, reviewing results, and reporting results to Counsel." [Filing No. 297 at 2.] She further says that she "r[an] searches" of the jsaini1@gmail.com account and "review[ed] those results." [Filing No. 297 at 2.] The only other Inspection Order work identified by Ms. Green is communicating with Ms. Attariwala or her then-counsel about passwords,

7

additional accounts, and additional devices and "creating recommendations on all devices for counsel." [Filing No. 297 at 2-3.]

However, outside of the Inspection Order, Ms. Green says she has done some work at the behest of Singota "for the purposes of their [sic] expert reports which does align with the work identified in the [Inspection Order]," and generically describes providing "analysis and assistance" with citation to her expert reports submitted by Singota in connection with Singota's Motion for a Preliminary Injunction. [Filing No. 297 at 4; *See also* Filing No. 85-2; Filing No. 95-1; Filing No. 105-1.] This statement is unhelpful to the Court as the ESI Team's Certification does not identify what devices or accounts, if any, were analyzed and what such work overlapped with the Inspection Order.[4]

Ms. Green has not removed any Singota electronically stored information from Ms. Attariwala's accounts and devices. This is so, she says, because the parties have not provided her with search terms to enable her to proceed under the protocol set forth in the Inspection Order. [Filing No. 297 at 8.]

## II.
### DISCUSSION

### A.      The Release of the ESI Team

The preliminary question of whether the ESI Team should be released as an officer of this Court for purposes of collecting, processing, and reviewing Ms. Attariwala's electronically stored information is easy to answer. Because the ESI Team's court-appointed work is not being funded

---

[4] As just one example, Ms. Green's October 31, 2019 report, [Filing No. 95-1], discusses at length information on Ms. Attariwala's Microsoft Surface. Yet, the ESI Team's Certification does not state that analysis and searches have been performed on that device, even though it is clear that Ms. Green has searched the device for Singota data. [*See, e.g.*, Filing No. 85-2 at 15 ("A search on the ESI found on Ms. Attariwala's Microsoft Surface computer…."]

and because the ESI Team's apparent dual role as an officer of the Court **and** testifying expert for Plaintiff has proved to be problematic in this instance, the Court **GRANTS** the ESI Team's request to be released as an officer of the Court.

**B.    Ms. Attariwala's Devices, Accounts, and Data in the ESI Team's Possession**

The much stickier question is what becomes of the devices, accounts, and data that Ms. Green gathered from Ms. Attariwala and the limited work that Ms. Green performed under the Inspection Order.  On this question, the ESI Team proposes four options "(1) return the materials to [Ms.] Attariwala and delete the copies made through its services; (2) transfer the materials to another ESI company; (3) transfer the materials to an agreed-upon ESI storage location; or (4) transfer the materials to Singota."  [Filing No. 271 at 4.]

Singota opposes the first option—*i.e.*, returning the materials to Ms. Attariwala—because "that approach would return to [Ms.] Attariwala the very trade-secret, confidential, and proprietary data and documents that [Ms.] Attariwala is prohibited from possessing" pursuant to the Court's preliminary injunction and her employment agreement with Singota.  [Filing No. 275 at 3.]  In the Singota Response,[5] Singota proposes that the parties submit proposals for a new court-appointed expert to carry out the unfinished work of the Inspection Order; the Court should appoint an expert; and Ms. Attariwala should be ordered to "submit a retainer or pay to the Clerk of the Court an initial payment of $55,000," which Ms. Attariwala should continue to replenish as work continues by the new court-appointed expert.  [Filing No. 299 at 35.]  Singota additionally proposes that the court-appointed expert submit status reports to the Court every 30 days.  [Filing No. 299 at 35.] Singota is also concerned about the work Ms. Green performed for it as a testifying expert (as

---

[5] Singota exhaustively recounts many details of the case and disputes facts that are not directly relevant to the question of what to do with the information that the ESI Team collected from Ms. Attariwala.  [*See generally* Filing No. 299.]

9

opposed to her role as court-appointed expert) and asks that Ms. Green be ordered to provide to Singota "[a]ll Singota property and materials provided by Singota to [Ms.] Green in her role as Singota's expert (including Singota computer(s), devices, and data that Singota provided to [Ms.] Green and any work product generated by [Ms.] Green relating to them" and further asks that Ms. Green "provide an index of all equipment, data, and work product that she possesses for Singota's review to ensure that none of Singota's property or work product is inadvertently" produced by Ms. Green to her replacement as a court-appointed expert. [Filing No. 299 at 34-35.]

Ms. Attariwala "strongly objects to any materials being sent to Singota for any reason and objects to this suggestion as an appropriate option." [Filing No. 276 at 2.] The Attariwala Response[6] further requests "the immediate return of [Ms. Attariwala's] accounts and devices with the removal of any and all Singota ESI completed by Ms. Green and a Court representative as the intermediary." [Filing No. 304 at 19.] She also has concerns about the disclosure of her and her family's personal and privileged information to Singota. [Filing No. 304 at 4; Filing No. 304 at 17.]

The ESI Team responds to the Singota Response by clarifying that Ms. Green "has already provided all her work product associated with Singota's work in her expert reports and in the correspondence with Singota's counsel." [Filing No. 300 at 3.] The ESI Team says it does not have a role in the Court's determination of what should happen to the devices, accounts, and data

---

[6] The Attariwala Response, like the Singota Response, includes pages upon pages of Ms. Attariwala disputing facts set forth in prior briefing that are not relevant to the question before the Court. [*See generally* Filing No. 304.] The Attariwala Response also purports to seek a smorgasbord of relief, not properly raised to the Court in a motion. [*See, e.g.*, Filing No. 304 at 19 ("Defendant also asks the Court to disregard any evidence provided by Ms. Green …. Defendant requests for this Court to authorize the Bankruptcy Court to go forward with the Adversary Proceeding.") Filing No. 304 at 20 ("Defendant asks for reconsideration of the Preliminary Injunction and Further Preliminary Injunction. … Defendant request for damages incurred including lost profits….").]

retrieved from Ms. Attariwala but asks that whatever the Court determines, that the order require the parties to act promptly.  [Filing No. 300 at 3.]  In response to Singota's proposal that Ms. Attariwala deposit $55,000 with the Court to pay a new court-appointed expert, the ESI Team asks that "any funds provided by [Ms.] Attariwala first be directed at satisfying the outstanding balance due to the ESI Team."  [Filing No. 300 at 4.]

The obvious complications in the Court's determination of what to do with Ms. Attariwala's devices, accounts, and data in the ESI Team's possession is Ms. Attariwala's *pro se* status, the absence of an expert retained on her behalf, and her apparent inability to finance a review of the devices, accounts, and data collected to date.

While the parties have not directed the Court to legal authority on what to do in this situation, the Court considers what is practical in view of the amount of time that has passed in this case, the current status of the parties, and the Court's desire and directive to move this case along.  The Court reiterates that the sole issue before it is what to do with the devices, accounts, and data currently in possession of the ESI Team pursuant to the Inspection Order.  The Inspection Order does not address Singota's computers or files that Ms. Green may have inspected and analyzed on behalf of Singota.  The Court finds that to move this case forward in view of Ms. Attariwala's stated inability to fund third-party review of her devices, accounts, and data and to enable Singota to achieve its stated purpose of this litigation—to recover its confidential and proprietary information—the best path forward is to enable Singota's ***counsel*** access to Ms. Attariwala's accounts, devices, and data in the ESI Team's possession to complete the procedures set forth in the Inspection Order.  The Court further finds that if it appointed another expert to act as a court officer, the same problems regarding financing the work to move the case forward would arise.

The Court is not unsympathetic to Ms. Attariwala's concerns about privileged and personal documents.  However, Ms. Attariwala's personal information should seemingly not include any of the information to be inspected and removed under the Inspection Order, and the Court will order that completion of the Inspection Order will not constitute a waiver of any applicable privilege.

Therefore, the Court will **ORDER** as follows:

1. Within 14 days, the ESI Team is to give Singota's counsel the devices, accounts, data, and copies or images of the same (the "Devices and Accounts") belonging to Ms. Attariwala, as well as any work performed on the Devices and Accounts pursuant to the Inspection Order.  Singota's counsel is prohibited from providing access to the Devices and Accounts to Singota or any other agent of Singota without the Court's prior approval.

2. Within 28 days after receipt of the Devices and Accounts, Singota's counsel is to provide Ms. Attariwala and the Court with a list of the data on Ms. Attariwala's devices and accounts that Singota contends belongs to it and needs to be removed from Ms. Attariwala's Devices and Accounts.

3. Once Singota's counsel provides the list, Ms. Attariwala has 14 days to object to the removal of any of the data identified by Singota's counsel.

4. Within 3 business days following an order by this Court resolving any disputes about the removal of alleged Singota data, Singota's counsel will ensure Ms. Attariwala's Devices and Accounts are returned to her.  Singota shall maintain a copy of the removed Singota data until the conclusion of this litigation, including any appeals, or until further order of the Court.

5. For purposes of completing the Inspection Order, Ms. Attariwala and her husband are not waiving and will not be deemed to have waived or diminished, any of its attorney work-product protections, attorney-client privileges or similar protections and privileges.

Singota's counsel is cautioned that counsel's sole purpose is to execute the procedures set forth in the Inspection Order, which is the location and removal of Singota's confidential and proprietary information.  Counsel is not permitted to engage in open-ended discovery as to the Devices and Accounts.

**C.    Recouping Fees "Advanced" by Singota to Ms. Green**

Although not properly before the Court in a motion, the Court notes Singota's request for the Court to order Ms. Green to submit "revised invoices for fees paid by Singota with detailed entries," and "[u]pon briefing of the parties or hearing, the Court should determine the fees owed by Ms. Attariwala on those invoices under Phase I … for work already completed by [Ms.] Green and paid by Singota." [Filing No. 299 at 35.] This request is not well-taken. Rather than seeking to enforce the Expenses Order, Singota decided to go around the Court and pay Ms. Green directly and dictate what work she completed outside of Court supervision. That was a decision Singota made, and the Court is not going to now ask Ms. Green to disentangle the work she was performing as Singota's testifying expert versus the work she was performing as an officer of the Court. Nothing in this prevents Singota from seeking such fees as damages in this Court or the bankruptcy proceedings.

## D.    Future Discovery Efforts

The Court notes that many of the current discovery battles appear to be related to efforts by Ms. Green and Singota to collect outstanding devices and accounts identified by Ms. Green from Ms. Attariwala and/or her husband. Many of these outstanding devices and accounts fall into the category of devices and account that were at some point connected to or accessed from a device that was known to contain or at one time accessed Singota information. For example, a Microsoft Surface Computer owned by Ms. Attariwala was found by Ms. Green to contain Singota's proprietary information, and therefore, pursuant to the Inspection Order, Ms. Green sought any device that was ever connected to the Surface, such as iPhones or USB devices, as well as any account, such as email accounts or iCloud accounts, that may have been accessed from the Surface, regardless of whether there is any evidence that the devices or accounts contains Singota information. [*See, e.g.*, Filing No. 111-1 at 24-29.] The Court reminds the parties that in the face

13

of this broad provision, the Court's Injunction provided a protocol for Ms. Attariwala to follow if she was unable to produce the devices or accounts:

> If Ms. Attariwala is unable to produce any of the outstanding accounts and devices identified by Ms. Green, she shall provide evidence in a proper verifiable form that she no longer has access to or possession of the accounts or devices of which she is unable to produce, and that no third party to whom she may have distributed Singota's confidential information continues to retain the accounts or devices in derogation of her requests that they be produced to Singota. She shall also indicate whether she has ever shared, copied, or transmitted any of Singota's confidential information to any account or device that she is unable to produce, and if so, provide proper assurances that she, nor any third party to whom she may have shared Singota's confidential information, continues to possess or maintain access to such information.

[Filing No. 122 at 3.]  At this point in the litigation—more than 2-½ years after it was initially filed—the Court urges Singota to focus its efforts on devices and accounts which it reasonably believes contain Singota information, not every account that may have been accessed on a computer or device, or every device that may at some point have been connected to a computer. *See* Fed. R. Civ. P. 1 (discussing objective of just, speedy, and inexpensive litigation); Fed. R. Civ. P. 26(b)(1) (noting that discovery is to be proportional).  The Court also notes that Singota has deposed Ms. Attariwala[7] and her husband, providing Singota the opportunity to ask questions under oath about the locations of any Singota information.

With these principles in mind, the Court will order the parties to meet and confer about the remaining discovery in this case and propose a schedule within which to complete that discovery.

### III.
#### CONCLUSION

Based on the foregoing, the ESI Team's Motion to be Released from Appointment as An Officer of the Court and for Distribution of Electronically Stored Information, [271], is

---

[7] Singota has deposed Ms. Attariwala in this case and in her bankruptcy case.

14

**GRANTED** to the extent that the ESI Team will be released from its obligations to this Court once it distributes the electronically stored information as ordered below.  The Court **ORDERS** as follows:

1. Within 14 days, the ESI Team is to give Singota's counsel the devices, accounts, data, and copies or images of the same (the "Devices and Accounts") belonging to Ms. Attariwala, as well as any work performed on the Devices and Accounts pursuant to the Inspection Order.  **Singota's counsel is prohibited from providing access to the Devices and Accounts to Singota or any other agent of Singota without the Court's prior approval**.

2. Within 28 days after receipt of the Devices and Accounts, Singota's counsel is to provide Ms. Attariwala and the Court with a list of the data on Ms. Attariwala's devices and accounts that Singota contends belongs to it and needs to be removed from Ms. Attariwala's Devices and Accounts.

3. Once Singota's counsel provides the list, Ms. Attariwala has 14 days to object to the removal of any of the data identified by Singota's counsel.

4. Within 3 business days following an order by this Court resolving any disputes about the removal of alleged Singota data, Singota's counsel will ensure Ms. Attariwala's Devices and Accounts are returned to her.  Singota shall maintain a copy of the removed Singota data until the conclusion of this litigation, including any appeals, or until further order of the Court.

5. For purposes of completing the Inspection Order, Ms. Attariwala and her husband are not waiving and will not be deemed to have waived or diminished, any of its attorney work-product protections, attorney-client privileges or similar protections and privileges.

The Court further **GRANTS** Singota's Motion to Extend Case Management Deadlines, [283], only to the extent that discovery may continue and **ORDERS** the parties to meet and confer about the remaining discovery needed to litigate this case to its conclusion and submit a joint proposed case schedule for the remaining of this case **on or before December 31, 2021**.

Finally, the Court **DENIES** Singota's Motion to Strike, [305].

Date: 11/30/2021

_Mario Garcia_
Mario Garcia
United States Magistrate Judge
Southern District of Indiana


**Distribution via ECF to all counsel of record**


**Distribution via U.S. Mail to:**

Ms. Jaspreet Attariwala
1390 Kenyon St., NW, Apt. 323
Washington, D.C.  20010

# Exhibit 3

Excerpt of transcript of Debtor's March 11, 2020 deposition

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF COLUMBIA


- - - - - - - - - -x
IN RE:                    :
                          :
JASPREET ATTARIWALA,  :   Case No. 19-00828-SMT
                          :   Chapter 13
      Debtor           :
- - - - - - - - - -x

                          Rockville, Maryland
                          March 11, 2020

Deposition Duces Tecum of:

           JASPREET ATTARIWALA

called for examination by counsel for the

Creditor BioConvergence, LLC, pursuant to

notice and agreement of counsel as to time and

place, at the Law Offices of Whiteford Taylor &

Preston, LLP, 111 Rockville Pike, Rockville,

Maryland, before Martin S. Scheinberg, a Notary

Public in and for the State of Maryland,

commencing at approximately 12:00 p.m., when

were present on behalf of the respective

parties:

_____

           SUBURBAN REPORTING SERVICE
            5303 Strathmore Avenue
           Kensington, Maryland 20895

             (240) 920-6886

Jaspreet Attariwala                                                                    3/11/2020

Page 2

APPEARANCES
On behalf of the Debtor:
    DAVID E. LYNN, ESQUIRE
    David E. Lynn, PC
    15245 Shady Grove Road, Suite 465N
    Rockville, Maryland 20850

On behalf of the Creditor BioConvergence LLC:

    NELSON C. COHEN, ESQUIRE
    Whiteford Taylor & Preston, LLP
    111 Rockville Pike, Suite 800
    Rockville, Maryland 20850

Also Present Via Telephone:
    Alisa Reagan
    Christopher Murray
    Stephen Gerald, Esquire

SUBURBAN REPORTING SERVICE    (240) 920-6886

Page 4

1   Whereupon,
2         JASPREET ATTARIWALA
3   was called as a witness, and, having first been
4   duly sworn by the Court Reporter, was examined
5   and testified as follows:
6      EXAMINATION BY COUNSEL FOR THE CREDITOR
7      BY MR. COHEN:
8      Q.   Good afternoon, Ms. Attariwala.  My
9   name is Nelson Cohen, as I think you know.  I
10  represent BioConvergence, LLC d/b/a Singota
11  Solutions in matters pertaining to your Chapter
12  13 bankruptcy case.
13         Let's start by asking you please to
14  state your full name and home address.
15     **A.   Jaspreet Attariwala.  Home address**
16  **is 1390 Kenyon Street Northwest, Apartment 223,**
17  **Washington, D.C. 20010.**
18     Q.   Do you have a business address?
19     **A.   It's my home address.**
20     Q.   You've been deposed before, have you
21  not?
22     **A.   Yes.**

Page 3

CONTENTS
JASPREET ATTARIWALA                    Page
    Examination by Mr. Cohen            4
    Examination by Mr. Lynn            115
    Further Examination by Mr. Cohen   117
    Further Examination by Mr. Lynn    117

EXHIBITS

                                       Page
No. 1    Notice of Deposition          5
No. 2    Documents in Answer to        7
         Request 1
No. 2A   Statement of Nissan           9
         Acceptance Corporation
No. 3    Cover Sheet (no documents)   13
         re: Request 2
No. 4    Response to Request 3        14
No. 5    Response to Request 4        20
No. 6    Response to Request 5        21
No. 7    Response to Request 6        36
No. 8    Response to Request 7        37
No. 9    Response to Request 8        38
No. 10   Response to Request 9        41
No. 11   Response to Request 11       43
No. 12   Debtor's Resume              43
No. 13   1/23/2020 Summary of Assets  51
No. 14   Chapter 13 Plan              55
No. 15   1/12/2020 Chapter 13 Statement  65
         of Current Monthly Income

1        PROCEEDINGS

SUBURBAN REPORTING SERVICE    (240) 920-6886

Page 5

1      Q.   I'm going to be asking you a series
2   of questions here today.  I'd like you to
3   listen carefully to my questions, if you do not
4   understand any of my questions please tell me
5   you don't and I will do the best I can to
6   restate the question so that you understand it.
7         If at any time during the deposition
8   you need a break for any reason just ask and I
9   will accommodate you in any way I can.
10        Having said that, do you have any
11  questions before we start?
12     **A.   No.**
13        MR. COHEN:  I'd like to have this
14  marked as Deposition Exhibit 1, please.
15        (Whereupon, Attariwala Deposition
16  Exhibit No. 1 was marked for identification.)
17        BY MR. COHEN:
18     Q.   Ms. Attariwala, you've been handed
19  by the reporter a document entitled "Notice of
20  Deposition Duce Tecum," which is marked as
21  Exhibit 1.  Have you seen that document before?
22     **A.   Yes.**

2 (Pages 2 to 5)

Page 14

1    **A.   Yes.**
2    Q.   Are there any documents?
3    **A.   Not at this time.**
4    Q.   Well, what do you mean by "not at
5    this time"?
6    **A.   I provided what I could for how I**
7    **understood the question, the request.**
8         MR. COHEN:  Can we have this marked
9    as the next exhibit, please?  That's 4.
10        MR. LYNN:  While you're doing that,
11   off the record.
12        (Off the record discussion.)
13        (Whereupon, Attariwala Deposition
14   Exhibit No. 4 was marked for identification.)
15        MR. COHEN:  Back on the record.
16        BY MR. COHEN:
17   Q.   Request number three asks you for
18   "All documents which in any way relate to your
19   assets, whether owned by you or with any other
20   entity."
21   **A.   Yes.**
22   Q.   Do you see that?

Page 15

1    **A.   Yes.**
2    Q.   I've handed you a document which has
3    been marked as Exhibit 4, Bates Stamped numbers
4    0006 through 0009; do you see that?
5    **A.   Yes.**
6    Q.   What are the documents that you have
7    produced in response to request number three?
8    **A.   This is the deed to my home, my**
9    **condo.**
10   Q.   Do you own other assets other than
11   your condo?
12   **A.   Does the car count?  The car.  Well,**
13   **I don't own it technically yet, so no.**
14   Q.   For example, do you own an interest
15   in an entity known as Honey Ji's?
16   **A.   Yes.  That's my dessert business.**
17   Q.   I'm sorry?
18   **A.   That's my dessert business.**
19   Q.   And it is, as I recall your prior
20   testimony, a Sub Chapter S Corporation?
21   **A.   Yes.**
22   Q.   Are you the sole stockholder of that

Page 16

1    company?
2    **A.   Yes.**
3    Q.   Do you have a certificate of
4    ownership or a stock certificate in that
5    company?
6    **A.   I'd have to check.**
7    Q.   I'd ask that that document be
8    produced since it is responsive to request
9    number three.
10        Do you own any jewelry?
11   **A.   Yes.**
12   Q.   Do you have any documents with
13   respect to any jewelry which you own, such as
14   insurance policy endorsements or appraisals?
15   **A.   I had an appraisal for my wedding**
16   **ring but I can't find it.**
17   Q.   What did you do to look for that
18   appraisal?
19   **A.   I checked my folders.**
20   Q.   The condominium is your residence,
21   is it not?
22   **A.   Yes.**

Page 17

1    Q.   Who owns the condominium?
2    **A.   I do.**
3    Q.   Does your husband have any interest
4    in that condominium?
5    **A.   Could you clarify your question?**
6    Q.   I'll ask a different question.  The
7    deed states that, on page 0007, "This deed made
8    the 25th day of August 2017 by and between Iya
9    Hermano (phonetic), Party of the First Part,
10   and Jaspreet K. Saini, Party of the Second
11   Part..." is that you?
12   **A.   Yes.  Saini is my maiden name.**
13   Q.   Were you married at the time you
14   acquired the condominium?
15   **A.   Yes.**
16   Q.   Why is it you acquired the
17   condominium in your maiden name and not your
18   married name?
19   **A.   Because I had not changed my name**
20   **yet legally.**
21   Q.   Who provided the consideration for
22   the purchase of the condominium?

# **Exhibit B**

Debtor's Exhibit 4

# In the Matter Of:

*IN RE: JASPREET K. ATTARIWALA*

---

## Jaspreet K. Attariwala, Volume III

*September 15, 2021*

---



**StewartRichardson**

DEPOSITION SERVICES

800.869.0873 | www.StewartRichardson.com

Reporting Driven by Excellence — Since 1975

INDIANAPOLIS | CARMEL | EVANSVILLE | FORT WAYNE | SOUTH BEND | VALPARAISO

1        IN THE UNITED STATES BANKRUPTCY COURT
          FOR THE DISTRICT OF COLUMBIA
2

3
  IN RE:                 )
4                       )
                       )  BANKRUPTCY CASE NO.
5  JASPREET K. ATTARIWALA,   )  19-00828-ELG
                       )
6        Debtor.       )

7

8

9                VOLUME III

10

11    The videotaped deposition upon oral examination

12  of JASPREET K. ATTARIWALA a witness produced and sworn

13  before me, Marlana M. Haig, RPR, CRI, Notary Public in

14  and for the County of Marion, State of Indiana, taken

15  on behalf of Creditor, Bioconvergence LLC, at 1390

16  Kenyon Street NW, Conference Room, Washington DC on

17  September 15, 2021, at 9:33 a.m., pursuant to the

18  Federal Rules of Civil Procedure.

19

20

21

22

23

24       STEWART RICHARDSON & ASSOCIATES
        Registered Professional Reporters
25            (800) 869-0873

```
 1                        APPEARANCES

 2

     FOR THE DEBTOR VIA ZOOM VIDEOCONFERENCE:
 3

       David E. Lynn, ESQ.
 4     DAVID E. LYNN, P.C.
       15245 Shady Grove Road
 5     Suite 465 N
       Rockville, MD 20850
 6     davidlynn@verizon.net

 7

     FOR THE CREDITOR, BIOCONVERGENCE LLC, VIA ZOOM
 8   VIDEOCONFERENCE:

 9     Christopher C. Murray, ESQ.
       OGLETREE, DEAKINS, NASH, SMOAK & STEWART, P.C.
10     111 Monument Circle
       Suite 4600
11     Indianapolis, IN 46204
       christopher.murray@ogletreedeakins.com
12

13   ALSO PRESENT VIA ZOOM VIDEOCONFERENCE:

14     Alisa Kilgas
       Bioconvergence LLC
15
       Steven Guillen
16     OGLETREE, DEAKINS, NASH, SMOAK & STEWART, P.C.

17

18

19

20

21

22

23

24

25
```

```
 1                    INDEX OF EXAMINATION

 2

 3    EXAMINATION                                        PAGE

 4    DIRECT EXAMINATION

 5    By Mr. Murray:                                     150

 6    CROSS-EXAMINATION

 7    By Mr. Lynn:                                        231

 8    REDIRECT EXAMINATION

 9    By Mr. Murray:                                     234

10    RECROSS-EXAMINATION

11    By Mr. Lynn:                                        235

12

13                    INDEX OF EXHIBITS

14

15     NUM.                DESCRIPTION                   PAGE

16

17    Exhibit 20    3-11-20 Deposition Transcript        150

18    Exhibit 21    Motion to Compel                     158

19    Exhibit 22    Chase Bank Statements                160

20    Exhibit 23    Caliber Home Loan Application        198

21    Exhibit 24    2019 Personal Tax Return             207

22    Exhibit 25    Honey Ji's 2019 Tax Return           209

23    Exhibit 26    Bank of America Statements           211

24    Exhibit 27    Chase Money Market Statements        200

25    Exhibit 28    Singh's Response and Objections       224
```

 1    you answered bank statements.  You were asked, do you

 2    have your bank statements, you said no.  And then

 3    skipping ahead to line 22 at the bottom of that page

 4    and carrying over to page 98, you were asked, do you

 5    have in your possession or your custody bank

 6    statements, and you answered at line 3, they are with

 7    my counsel.  Did I read that correctly?

 8  A Yes.

 9  Q So as of March 11th, 2020, had you provided your bank

10    account statements to your counsel?

11  A The ones that I thought that I needed to at the time,

12    yes.

13  Q And which ones had you provided to your counsel at

14    that time?

15  A You'd have to ask my counsel.

16  Q Well, I assume that you would object that that's

17    privileged.

18  A That is correct.  I don't know how to answer with

19    certainty exactly which documents he had at that time

20    on that date.

21  Q You recall having provided statements for banking

22    accounts before that date to your counsel?  Is that

23    correct?

24  A Yes.  Yes.

25  Q Okay.  All right.  I'm going to show you -- we're

1    going to go back to Exhibit 17.  And this was an

2    exhibit that we previously used.  As you can see, this

3    is a summary of your assets and liabilities that you

4    filed in this case on January 23rd, and I believe this

5    is an amended version of one that you had filed

6    earlier.  Do you have that on the screen in front of

7    you?

8    A Yes.  Could you please enlarge it?

9    Q Is that better?

10   A No.

11   Q Okay.  Does that help?

12   A Yes.

13   Q Okay.  Okay.  I'm going to turn your attention to part

14   4 of schedule A/B.  Do you have that on the screen in

15   front of you --

16   A Yes.

17   Q -- part 4?  Okay.  And part 4 asks you do you own or

18   have any legal or equitable interest in any of the

19   following.  Do you see that?

20   A Yes.

21   Q And to the right of that it asks you to describe the

22   current value of the portion you own.  Do you see

23   that?

24   A Yes.

25   Q Okay.  And under section 17 is listed deposits of

```
 1    money, and you identified a savings account at Chase,

 2    a checking account at Chase, a savings account at Bank

 3    of America and a checking account -- I'm sorry, a

 4    checking and a savings account at Bank of America.

 5    Did I state that correctly?

 6  A Yes.

 7  Q And to the right of each of those accounts that you

 8    listed, there's an amount listed.  In 17.1, the

 9    checking account at Chase, you listed $2,057.60.  Do

10    you see that?

11  A Yes.

12  Q How did you know what the amount of that account was

13    when this form was completed?

14  A I would have most likely checked.

15  Q And how would you have gone about checking what the

16    mount of money was in that account at the time this

17    form was being completed?

18  A By logging in -- by checking my account.

19  Q By logging into it online?

20  A Correct.  That's generally how I check.

21  Q Okay.  And, actually, let me ask you, did you complete

22    this form?

23  A With assistance from my attorney.  I relied on my

24    attorney.

25  Q Okay.  I mean did you actually input the information?
```

 1   A I don't understand your question.

 2   Q Who input -- for example, in 17.1, where it says

 3     $2,057.60, who actually input that number into this

 4     form?

 5   A I think it was my counsel.

 6   Q Okay.  So -- and is that information then that you

 7     provided to your counsel?

 8   A Yes.

 9   Q Okay.  For -- for all of these accounts listed here in

10     section 17, were you able to log into those accounts

11     online to check the balances?

12   A Based on my memory, yes.

13   Q And when you logged in, could you also download the

14     bank statements?

15   A That is a feature.

16   Q And you ultimately did produce bank statements in this

17     case.  How did you go about collecting those

18     statements?

19   A I retrieved them from my account.

20   Q By downloading them?

21   A I guess so.  I don't remember exactly the format, but

22     I retrieved them from the website.

23   Q Okay.  And so you could have retrieved those banking

24     statements before your deposition on March 11th, 2020;

25     correct?

1  A Which statements?

2  Q The statements for the accounts that are referred to

3    here in your answer to question 17.

4  A Right.  Could you be more specific with your question?

5  Q Okay.  So we're looking at question 17, deposits of

6    money; correct?

7  A Yes.

8  Q And there are accounts listed for Chase Banking and

9    Bank of America; correct?

10 A Yes.

11 Q Could you have downloaded the statements, the accounts

12   that are listed here, before your deposition on March

13   11th, 2020?

14 A For -- on that date?  For that date?  Is that what

15   you're asking?  I'm asking for a time frame so I

16   understand your question.

17 Q You could have downloaded the statements for these

18   accounts before March 11th, 2020; correct?

19        MR. LYNN:  Mr. Murray, may I help out here a

20   little bit?

21        MR. MURRAY:  Actually, Mr. -- Mr. Lynn.  I would

22   just like her to -- if you don't mind, I'd just like

23   her to answer the question.

24        MR. LYNN:  That's fine.

25        MR. MURRAY:  It seems like a relatively

 1   straightforward question.

 2        MR. LYNN:  I was just going to reframe your

 3   question, but I'll refrain from doing that.

 4        THE WITNESS:  Could you please repeat the

 5   question?

 6   BY MR. MURRAY:

 7   Q You could have downloaded the statements for these

 8     accounts that are listed in your response to item 17

 9     before March 11th, 2020; correct?

10        MR. LYNN:  Mr. Murray, what statements and for

11   what periods are you referring to?  You say she could

12   have -- your question said -- asks could she have

13   downloaded the statements before the deposition on

14   March 11, 2020, but it doesn't say which statements or

15   for what period, and I think that's where the witness

16   is struggling a little bit.

17        MR. MURRAY:  Okay.  All right.  Thank you for

18   that.  Thank you.

19   Q The statements that you ultimately produced in this

20     case, to the extent they existed before you produced

21     them, you could have downloaded those before your

22     deposition on March 11th, 2020; correct?

23   A Yes.

24   Q On Exhibit 17, I'm going to draw your attention to

25     item 21, which refers to retirement or pension

1    in the room, so I -- I'm not -- there's an

2    interruption in the room.

3            MR. MURRAY:  Okay.  We can go off the record for

4    a moment.

5            THE WITNESS:  Okay.

6            (A discussion was held off the record.)

7    BY MR. MURRAY:

8    Q So we're looking at Exhibit 20 -- 21 here.  And are

9      you aware that Singota filed a motion to compel

10     production of documents in July of 2020 in this case?

11   A Yes.

12   Q I wanted to turn your attention to paragraph 14 of

13     the -- this motion.  And in 14 it states, at her

14     deposition, the Debtor acknowledged that her bank

15     statements were in the possession of her counsel.

16     Singota has requested that it be given copies of the

17     bank statements relying on requests 3, 8 and 9.

18            Why had you not produced your bank statements by

19     July of 2020?

20   A I produced what I thought I was required to produce.

21   Q So you thought you were not required to produce bank

22     statements?

23   A No, I thought I did produce bank statements.

24   Q Okay.  You had not produced any bank statements by

25     July of 2020.

1  A Okay.

2  Q Do you recall why you had not produced bank statements

3    by that time?

4  A No, I don't.

5  Q And do you recall that there was a hearing in this

6    case on Singota's objection to confirmation of your

7    Chapter 13 plan?

8  A Yes.

9  Q And that hearing was on August 22nd, 2020, and you

10    testified at that hearing; correct?

11 A I don't remember testifying, but I remember the

12    hearing.

13 Q Okay.  And why had you not produced bank statements

14    prior to the August 22nd, 2020 hearing?

15 A I -- I don't know.  I don't remember.  I thought I

16    did.

17 Q I'm going to show you now Exhibit 22.  And I'll

18    represent to you that these are bank statements that

19    you produced from Chase Bank on August 31st, 2020.

20    There's a cover page that's attached to these that

21    Singota had added, so the cover page C was added by

22    Singota -- Exhibit C, rather.  Do you have this on

23    your screen?

24 A Yes.

25 Q All right.  I seem to be having a moment -- a problem

1     sharing this.  Let me try this again.

2          Okay.  Are you able to see that okay?

3   A Yes.

4   Q And so this exhibit is 105 pages long, and again the

5     cover page was added by Singota.  I'm not going to

6     scroll through this slowly.  I'll go through quickly,

7     but again I'll represent to you that these are the

8     Chase checking and savings account statements that you

9     produced on August 31st.

10         When did you collect these from Chase in order to

11    produce them?

12  A I don't know the dates.

13  Q Well, what's the approximate time?

14  A I don't remember.

15  Q Was it the spring of 2020?

16  A I -- I don't remember.

17  Q You have no recollection when between December of 2019

18    and August 31st of 2020 when you gathered these

19    statements?

20  A That's correct.

21  Q On August the 31st, you did not produce statements for

22    your Chase money market account.  Why is that?

23  A I don't know.

24  Q And with your August 31st production, you also did not

25    include any statements for accounts for Honey Ji's.

1      Why is that?

2   A  I produced the documents I thought I was supposed to.

3   Q  Okay.  So the documents that you produced, I'll also

4      represent for the record that there are redactions in

5      this copy of the statements.  The redactions were made

6      by Singota before it filed these documents with the

7      Court, so these blacked-out redactions were made by

8      Singota.

9          There are Bates numbers on these documents, and

10      the Bates numbers read Attariwala-Chase Bank

11      statements 2018-2019 dash, and then they start with

12      001.  I'd like to draw your attention to the page

13      that's Bates numbered 002.  You can see that here at

14      the bottom of the center of the page, and I'll scroll

15      to the top.  Is this -- is this from your statements

16      for November 30th through December 31st, 2019?

17   A  Could you please enlarge that?

18   Q  Sure.  Does that help?

19   A  Yes.

20   Q  Okay.

21   A  Can you repeat your question?

22   Q  Sure.  Is this a page from your Chase Banking

23      statements for your checking and savings account for

24      the time period November 30 through December 31st,

25      2019?

1          I wanted to draw your attention to -- under

2     deposits and additions, there's an entry on 07/05, the

3     description is manual CR-BKRG in the amount of

4     $20,000.  Is that a transfer from your Chase brokerage

5     account?

6   A I think so, yes.

7   Q I wanted to scroll down to the next section.  Under

8     electronic withdrawals on 07/05, there are multiple

9     entries on that day.  Do you see actually there are

10    one, two, three, four, five, six, seven -- seven

11    entries on July 5th, 2019?  Do you see that?

12  A Yes.

13  Q And do you recall why you were making all those

14    payments on July 5th, 2019?

15  A Could you be more specific?

16  Q Is there a reason why you made all those -- all those

17    payments at the same time on July 5th, 2019?

18  A Well, I had to fix stuff in my house.

19  Q On the fourth entry down on July 5th, is that a wire

20    transfer to some trust to the account of David Lynn

21    for a thousand dollars?

22  A Yes.

23  Q And was that for the payment of attorneys' fees for

24    the bankruptcy case?

25  A Legal fees, yes.

```
1    Q And you had already provided a retainer to Mr. Lynn in
2      May of 2019; correct?
3    A Yes.
4    Q Had that -- had that retainer that you provided in May
5      already been expended by July 2019?
6    A Probably, given the contentious litigation that this
7      has been.
8    Q Okay.  And so that's the time period between May and
9      July of 2019; correct?
10   A Yes.
11   Q And that's before you filed the bankruptcy case;
12     correct?
13   A Yes.  I filed it in December.
14   Q Okay.  So you had already expended over $7,000 in
15     attorneys' fees on the bankruptcy matter by July 5th,
16     2019?
17   A Without looking at the records, I can't say for sure.
18   Q Also looking back on page -- on that same page, Bates
19     numbered 025, also on July 5th, do you see there's a
20     wire transfer, it's a First National -- First
21     Financial Bank referring to McNeely Stephenson for
22     $2,600?
23   A Yes, I see that.
24   Q And is that also payment for attorneys' fees?
25   A Yes.
```

```
 1   Q Did they ever threaten to take any collection actions
 2     against you to recover the payment of those loans?
 3   A No.
 4   Q And your parents did not file a claim in this
 5     bankruptcy, did they?
 6   A I don't know who filed the claims.
 7   Q So you don't know whether or not your parents filed a
 8     claim in this bankruptcy case?
 9   A I'd have to check the documents.
10   Q Have you ever had any discussions with your parents
11     about whether they'd file a claim in the bankruptcy
12     case?
13   A No.
14   Q By December of 2019, how much money did you owe
15     McNeely Stephenson?
16   A A lot.
17   Q And had they made any demands that you repay that
18     amount or rather that you pay that amount by a
19     specific deadline?
20   A What dates are you asking for?
21   Q By December --
22   A Give me dates.
23   Q By December 2019, had McNeely Stephenson given you a
24     deadline to make payments of their owed attorneys'
25     fees?
```

1    A  Isn't that privileged?

2          MR. LYNN:  Probably is.

3          THE WITNESS:  Thank you.

4    Q  Had -- by December of 2019, had McNeely Stephenson

5       threatened to pursue any collection actions against

6       you for the payment of owed attorneys' fees?

7          MR. LYNN:  That may also be privileged.

8          MR. MURRAY:  I think -- well, first of all,

9       Ms. Attariwala, are you declining to answer both of

10       those questions on the advice of your counsel?

11          THE WITNESS:  Yes.

12          MR. MURRAY:  Marlana, would you please certify

13       those two questions.

14    BY MR. MURRAY:

15    Q  I wanted to draw your attention now to the page that's

16       Bates numbered 98.  Okay.  There's the Bates number

17       98.  This is for the time period February 1st through

18       February 28th, 2018.  Do you see that?

19    A  Yes.

20    Q  You have that on the screen?  Okay.  I want to draw

21       your attention under deposits and additions.  On

22       02/21, do you see there's an entry JPMS brokerage

23       manual CR-BKRG in the amount of $30,000?  Do you see

24       that?

25    A  Yes.

```
 1       to produce.
 2   Q And so you withheld those documents because you didn't
 3       think that you had to produce them before November of
 4       2020?
 5   A No.
 6   Q Then why did you not produce them?
 7   A I produced what I thought I was supposed to produce,
 8       what I thought I had to.
 9   Q So what you're saying is you didn't think that you
10       were supposed to produce those documents; is that
11       correct?
12   A Not exactly.
13   Q Well, why did you -- why did you not produce them
14       before November of 2020 then?
15   A I produced them when I produced them.
16   Q How did you go about collecting those documents for
17       production?
18   A Through my account.
19   Q You logged into it online?
20   A Yes.
21   Q And downloaded the statements from the Chase website?
22   A I think so.
23   Q We're going to look at Exhibit 24, if I can find it
24       here.
25           Okay.  Ms. Attariwala, do you have Exhibit 24 on
```

1    A I can't say for sure.

2    Q What information do you provide to your accountants so

3       that they can correctly and accurately report your

4       income, including capital gains and ordinary dividend

5       income?

6    A Tax documents.

7    Q Okay.  And do you have any reason to believe that you

8       didn't -- that you didn't receive tax documents from

9       Chase in early 2020 relating to your dividend income

10      and capital gains income on the money market account

11      for 2019?

12   A No.

13   Q I notice that your taxes for 2019 look like they were

14      filed in October of 2020; is that correct?

15   A Correct.

16   Q Why were they filed late that year?

17   A I was having health complications.

18          MR. LYNN:  Object to the characterization of as

19      late.

20          MR. MURRAY:  Oh, let me withdraw that question.

21      I'll move to the next exhibit here.

22   Q Ms. Attariwala, this is Exhibit 25.  Do you have that

23      on your screen?

24   A Yes.

25   Q Again, I'll represent these are documents that were

1   produced to us in this case.  I'll scroll through --

2   this exhibit is 14 pages long, and it appears to be

3   the tax return for Honey Ji's for 2019.  Do you see

4   that?

5  A The screen is not moving.

6  Q Okay.  Let me -- let me try that again.  Okay.  Are

7   you able -- no, that's not right.

8       Okay.  Ms. Attariwala, are you able to see this

9   exhibit now?

10 A Yes.

11 Q Okay.  And is this the 2019 tax return for Honey Ji's?

12 A Yes.

13 Q Okay.  I wanted to turn your attention to the page

14  that's Bates numbered 007 of this exhibit.  Do you see

15  section L, which is the balance sheets per books?  Do

16  you see that section?

17 A Yes.

18 Q And line number 1 for cash, and then far over to the

19  right lists $1,647.  Do you see that?

20 A Yes.

21 Q And then down at line 15 it says total assets, and

22  that's $1,647; is that correct?

23 A Yes.

24 Q So by the end of 2019, did Honey Ji's have at least

25  $1,647 in cash?

1   A I'd have to check.

2   Q Well, if you reported that on your taxes, do you have

3      any reason to believe that's inaccurate?  I'm sorry,

4      if Honey Ji's reported that on its taxes, do you have

5      any reason to believe that would be inaccurate?

6   A I was relying on my accountant, so I'd have to check

7      what that was.

8   Q Now, turning to the page that's Bates numbered 003, do

9      you see section part 2, declaration and signature

10      authorization of officer?  Do you see that?

11   A Yes.

12   Q And below that, is that your signature as an officer

13      dated July 7th, 2020?

14   A Yes.

15   Q All right.  I'm going to share our next exhibit here.

16      Okay.  Do you have Exhibit 26 on the screen in front

17      of you?  These are statements from Bank of America?

18   A Yes.  Can you make that bigger?

19   Q Sure.  Does that help?

20   A Yes.

21   Q Okay.  So I'll represent to you that these were

22      statements that you produced to us in this case.

23      There are 146 pages in this exhibit, and these were

24      produced on November 2nd, 2020.  And first I wanted to

25      draw your attention to the page that's Bates numbered

1  motion to stay the confirmation of your Chapter 13

2  plan?

3  A Yes.

4  Q You only produced these statements relating to the

5  money market account after Singota had filed its

6  motion to stay confirmation of your Chapter 13 plan.

7  Why did you wait to produce these until November 2nd,

8  2020?

9  A I produced what I thought I was supposed to produce.

10 Q Okay.  I'm going to turn your attention now -- looking

11 back at Exhibit 17, in section 17 for deposits of

12 money, you did not identify the money market account

13 ending 6232, did you?

14 A I'd have to look at the whole document again.

15 Q Well, I'm going to draw your attention here to section

16 17, so let's start with section 17.  That runs from

17 page -- page 3 to page 4 of this official form 106A/B.

18 And, again, actually I want to draw your attention to

19 the beginning of this section, which is part -- part

20 4.  Part 4, it asks you to describe your financial

21 assets and asks do you own or have you any legal or

22 equitable interest in any of the following, and

23 section 17 asks for deposits of money.

24      In section 17, you did not identify the Chase

25 money market account ending 6232, did you?

1    A I completed the form with my attorney.

2    Q So just to be clear for the record, are you claiming

3       that you relied on the advice of counsel as the reason

4       you did not disclose the Chase money market fund

5       ending 6232 in section 17?

6    A No.  That is not what I'm saying.

7    Q So why did you not disclose the money market account

8       in section 623 -- or ending in 6232 in section 17?

9    A It was probably an oversight.

10   Q I want to draw your attention to the following

11      question, section 18, which is titled bonds, mutual

12      funds or publicly traded stocks and gives as examples

13      bond funds, investment accounts with mortgage firms

14      and money market accounts.  Do you see that?

15   A Yes.

16   Q And you checked no below that; is that right?

17   A That's what it says.

18   Q And why did you not disclose the Chase money market

19      account ending 6232 in response to question 18?

20   A It was an oversight.

21   Q Now, at the beginning of 2019, you had over $30,000 in

22      funds in the Chase money market fund; correct?

23   A That's correct.

24   Q And as recently as December 3rd, 2019, you were

25      transferring over $12,000 out of the Chase money

```
 1    market account into your Chase checking accounts;

 2    correct?

 3  A Correct.

 4  Q And you had disclosed the Chase money market account

 5    on your Caliber Home Loan application; correct?

 6  A That is correct.

 7  Q And you paid taxes each year on the dividends and --

 8    ordinary dividends and capital gains that you earned

 9    on the Chase money market account; correct?

10  A Correct.

11  Q Did you believe that if you brought the account down

12    to zero, the balance down to zero in the Chase money

13    market account, you would not be required to disclose

14    it on your bankruptcy schedules?

15  A No.

16  Q So just to be clear, you are not claiming that you did

17    not disclose that account because the account balance

18    was zero; is that accurate?

19  A I -- could you repeat your question?  Could you

20    clarify your question?

21  Q I'll withdraw the question.

22        I want to draw your attention now to Exhibit 34.

23    I've skipped --

24        MR. MURRAY:  And, Marlana, for your -- for your

25    notice, or for your record, I've skipped a number of
```

 1   affairs, and wanted to draw your attention to question

 2   20.  And in question 20 you were asked within one year

 3   before file -- you filed for bankruptcy, were any

 4   financial accounts or instruments held in your name or

 5   for your benefit closed, sold, moved or transferred,

 6   including checking, savings, money market or other

 7   financial accounts.  You answered that question no;

 8   correct?

 9 A Yes.

10 Q And so this question called on you to consider whether

11   you had any financial accounts, including money market

12   accounts, that had been closed during the prior year;

13   correct?

14 A Yes.

15 Q And you did not disclose the Chase money market

16   account as an account that had been closed in the

17   prior year; correct?

18 A I don't think it's closed.

19 Q So you agree that it's not closed, and yet you had not

20   disclosed it as an account on your A/B schedule;

21   correct?

22 A As I said earlier, it was an oversight.

23 Q Did you provide any statements relating to your Chase

24   money market account to your attorney before you filed

25   bankruptcy?

```
 1   A  Isn't that privileged?

 2   Q  Providing documents --

 3          MR. LYNN:  You can answer.

 4          MR. MURRAY:  I'm sorry.

 5   A  I think I did.

 6   Q  Ms. Attariwala, my final question is did you receive

 7      an appraisal for your engagement ring in the -- in the

 8      amount of $23,000?

 9   A  I don't know.

10   Q  You wouldn't recall if your engagement ring was

11      appraised in that range of value?

12   A  I don't remember my appraisal.

13   Q  Did you save a copy of your appraisal to your Singota

14      computer?

15   A  I don't think I would do that.

16   Q  Did you allow Mr. Singh to save a copy of your

17      appraisal to your Singota computer?

18   A  Mr. Singh didn't have access to a Singota computer.

19   Q  So how would a copy of the appraisal for your

20      engagement ring end up on your Singota computer?

21   A  Again, I don't think there would be a copy on my

22      Singota computer.

23          MR. MURRAY:  I have no further questions.  Thank

24      you.

25          MR. LYNN:  Thank you.  My turn.
```

```
 1   CROSS-EXAMINATION

 2   BY MR. LYNN:

 3   Q Ms. Attariwala --

 4   A Hi, David.  Yes.

 5   Q -- do you recall an offer for employment by Emergent,

 6     the offer to which Mr. Murray referred as his Exhibit

 7     11, that it referred to the issuance to you of

 8     restricted stock units in connection with your

 9     employment?

10   A Do I recall that paragraph?

11   Q That the --

12   A Sorry, the internet is not connecting.  Could you

13     repeat your question?

14   Q Yes.  Do you recall that Emergent's offer to you of

15     employment, which was Mr. Murray's Exhibit No. 11,

16     referred to issuing you restricted stock units?

17   A Yes.

18   Q Do you have any record that you ever received any such

19     restricted stock units?

20   A No.

21   Q Next question, why does your bankruptcy petition say

22     that your debts were primarily business debts?

23   A That was done by my attorney, you, and I think there

24     was something wrong with it because the debts that I

25     have are related to my employment potentially.
```

1  Q At one point you testified that your debts were mainly

2     those of Honey Ji's.  Is that accurate?

3  A That's not accurate.

4  Q When Mr. Murray asked you who were your other

5     creditors, who were your creditors, you answered your

6     parents, credit cards and your attorney.  Were there

7     any others?

8  A Yes.  The biggest animal in the room, Singota.

9  Q Mr. Murray showed you his Deposition Exhibit No. 14,

10    which was titled order on December 13, 2019 settlement

11    conference.  Prior to your deposition by Mr. Murray,

12    had you ever seen that order before?

13 A No.

14 Q At one point in your deposition you testified you had

15    not met with bankruptcy counsel prior to December

16    2019.  Was that accurate?

17 A No.

18 Q How did you become entitled to Chase Private Client

19    status so far as you can tell?

20 A I consolidated my retirement accounts, and they

21    changed my account type --

22 Q At that time --

23 A -- to Chase Private Client.

24 Q I'm sorry.  Sorry to speak over you.

25        Did you have anything close to $250,000 in

```
 1    retirement accounts?

 2  A No.

 3  Q During your deposition, you testified you did not

 4    recall what your payments to Andrée Martin were for.

 5    Have you subsequently remembered?

 6  A Yes.

 7  Q What were they for?

 8  A She was my mentor and business coach.  I paid her what

 9    I could.

10  Q Okay.  When you did the prebankruptcy consumer credit

11    counseling, had you decided, made a decision, to file

12    for bankruptcy?

13  A No.

14  Q You testified that you have no current real estate

15    listings.  Do you have anything to add to that?

16  A I personally do not have any listings.  I am on a

17    team, and my name gets added to team listings.

18  Q Mr. Murray just asked you about an appraisal of your

19    engagement ring.

20  A Yes.

21  Q Do you know if such an appraisal was done, for what

22    purpose it was done?

23  A I think it was done, and it was done for insurance

24    purposes.

25  Q At the time that you listed your ring in your
```

1   bankruptcy schedules, how did you arrive at the value

2   that you listed?

3   A I guessed at what the resale value would be.

4   Q When you filed your bankruptcy, how much could you

5   have sold your Honey Ji business for?

6   A Nothing.

7   Q Why is that?

8   A Because it wasn't operating.  I didn't have my

9   recipes.  I didn't have access to my social media

10  accounts.  I had a lot of -- I have a lot of potential

11  with Honey Ji, but it's locked up with Singota and

12  Green.

13       MR. LYNN:  No further questions.

14       THE REPORTER:  You're on mute, Mr. Murray.

15       MR. MURRAY:  Thanks.

16  REDIRECT EXAMINATION

17  BY MR. MURRAY:

18  Q Just one question, Ms. Attariwala.

19       The Chase Bank account statements that you

20  produced on August 31st of 2020 show your address as

21  890 Mango Avenue, Morton Grove, Illinois.  Did you

22  live at that address?

23  A Previously.  That was an old address.

24  Q And why would your account statements as of, for

25  example, December 31st, 2019, still have that address

```
 1   STATE OF INDIANA        )
                             ) SS:
 2   COUNTY OF MARION        )

 3

 4        I, Marlana M. Haig, RPR, CRI, a Notary Public in

 5   and for said county and state, do hereby certify that

 6   the deponent herein, was by me first duly sworn to

 7   tell the truth, the whole truth, and nothing but the

 8   truth in the aforementioned matter;

 9        That the foregoing deposition was taken on behalf

10   of the Creditor, Bioconvergence LLC; that said

11   deposition was taken at the time and place heretofore

12   mentioned between 9:33 a.m. and 1:15 p.m.;

13        That said deposition was taken down in

14   stenographic notes and afterwards reduced to

15   typewriting under my direction; and that the

16   typewritten transcript is a true record of the

17   testimony given by said deponent;

18        And thereafter presented to said witness for

19   signature; that this certificate does not purport to

20   acknowledge or verify the signature hereto of the

21   deponent.

22        I do further certify that I am a disinterested

23   person in this cause of action; that I am not a

24   relative of the attorneys for any of the parties.

25        IN WITNESS WHEREOF, I have hereunto set my hand
```

```
 1    and affixed my notarial seal this 20th day of

 2    September, 2021.

 3

 4

 5

 6

 7

 8

 9    County of Marion

10    My Commission Expires:
      September 13, 2026

11

12    Job No. 165778

13

14

15

16

17

18

19

20

21

22

23

24

25
```

Marlana M. Haig
NOTARY PUBLIC SEAL
STATE OF INDIANA
Commission No. NP0600892
My Commission Expires Sept. 13, 2026

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | |
|---|---|
| BIOCONVERGENCE LLC, *d/b/a Singota Solutions*, | ) ) ) |
| *Plaintiff*, | ) ) |
| vs. | )   1:19-cv-1745-SEB-MG ) |
| JASPREET ATTARIWALA, | ) ) |
| *Defendant*. | ) ) |

## <u>ORDER</u>

Pending before the Court is Plaintiff BioConvergence LLC's (doing business as Singota Solutions ("<u>Singota</u>")), Motion for "Declaration that Plaintiff May Properly File in Defendant's Bankruptcy Case Documents Relating to Defendant that Rebecca Green Produced in this Litigation" (the "<u>Bankruptcy Discovery Motion</u>"). [<u>Filing No. 320</u>.] Ms. Attariwala has filed a response,[1] [<u>Filing No. 329</u>], and Singota has filed a reply, [<u>Filing No. 336</u>].

In short verse, *pro se* Defendant Jaspreet Attariwala filed a Chapter 13 bankruptcy petition in the U.S. Bankruptcy Court for the District of Columbia in December 2019. *In re Jaspreet Attariwala*, Case No. 19-00828-ELG (Bankr. D.D.C.). Singota has appeared in the bankruptcy proceeding and filed a claim and adversary proceeding, in addition to numerous motions and

---

[1] Ms. Attariwala's response, [<u>Filing No. 329</u>], is styled as a "Motion for Reconsideration" of the Court's prior Order, [<u>Filing No. 328</u>], granting Singota permission to file Ms. Attariwala's personal documents under seal rather than publicly. However, a review of that Motion reveals that Ms. Attariwala mistakenly thought that the Court's Order sealing the documents granted Singota's Bankruptcy Discovery Motion. [*See* <u>Filing No. 329</u>.] Therefore, the Court **DENIES** Ms. Attariwala's Motion to the extent it seeks reconsideration of permission to seal documents and instead construes the filing as a response to Singota's Bankruptcy Discovery Motion because the sum and substance of Ms. Attariwala's filing addresses that motion.

Debtor's Exhibit 5

objections.  In the Bankruptcy Discovery Motion, Singota asks that it be permitted to file a 2015 engagement-ring appraisal and a 2017 statement related to a brokerage account held by Ms. Attariwala with the Bankruptcy Court.[2]   Singota says that it came into possession of these documents in *this* litigation because they were provided to Singota by its prior expert, Rebecca Green, under the Inspection Order, [Filing No. 85-7], even though under the Inspection Order, Ms. Green was only to provide to Singota data containing Singota's confidential and proprietary information, which these documents clearly do not.  [*See* Filing No. 85-7.]  Singota does not argue that the personal documents are relevant to *this* litigation.  Singota argues that Ms. Attariwala waived any objection to Singota possessing her personal financial documents because Ms. Attariwala's former counsel in this litigation did not object to Ms. Green's proposal to give these documents to Singota in November 2019.  [*See* Filing No. 320 at 1-3.]

Ms. Attariwala objects to Singota's request.  She correctly notes that that the Inspection Order was meant as a vehicle to identify and recovery Singota's confidential and proprietary information, not as a tool for Singota to access Ms. Attariwala's personal documents.  [Filing No. 329 at 2.]

Under the Inspection Order, Ms. Green was to "provide a list of files identified as *potentially responsive* to both parties' counsel, including file name, harvest location, created, modified and accessed dates, as well as common metadata field."  [Filing No. 85-7 at 8 (emphasis added).]  Apparently, Ms. Green simply identified all files within the "Jessie Docs" folder rather than identifying only those files that potentially contained Singota information.

---

[2] Singota says it needs to file the appraisal and account statement with the Bankruptcy Court to show that Ms. Attariwala allegedly concealed assets (notwithstanding that these documents were apparently in the possession of Ms. Green and/or Singota at the time of Ms. Attariwala's Chapter 13 petition) in furtherance of Singota's efforts to have Ms. Attariwala's Chapter 13 petition dismissed as filed in bad faith.  [Filing No. 320 at 4.]

Regardless of any waiver issue, the Court is putting Singota on notice that it will not permit it to litigate Ms. Attariwala's bankruptcy case through proceedings in this Court.[3]  Instead, Singota should focus on removing its information pursuant to the Inspection Order, [Filing No. 85-7], and the Court's ESI Orders, [Filing No. 311 and the order addressing Singota's Motion for Reconsideration that is being filed concurrently with this order], so that Ms. Attariwala's devices, accounts, and data are promptly returned to her.  The return of Ms. Attariwala's property to her would enable her to produce relevant documents in the bankruptcy proceedings.

However, this Court is sensitive to the Bankruptcy Court's need to promptly resolve Ms. Attariwala's bankruptcy petition.  The Court further notes that Ms. Attariwala does not contend that this information is irrelevant to the Bankruptcy Court proceedings.  Therefore, Singota's Motion, [320], is **GRANTED** to the extent the Court's permits Singota leave in this limited instance to file the 2015 appraisal and the 2017 account statement with the Bankruptcy Court. Singota should not expect leave to be granted in the future as the Court expects Ms. Attwariwala's devices, accounts, and data to be promptly returned to her as set forth in the Court's ESI Orders.

Ms. Attariwala's Motion for Reconsideration, [329], of the Court's order permitting certain documents to be filed under seal in this case is **DENIED**.

Date: 2/1/2022

Mario Garcia
United States Magistrate Judge
Southern District of Indiana

---

[3] Indeed, Singota's counsel has objected to Ms. Attariwala's bankruptcy counsel using any discovery provided in this litigation in the bankruptcy case.  [*See* Filing No. 250-2 at 141.]

**Distribution via ECF to all counsel of record**

**Distribution via U.S. Mail to:**

Ms. Jaspreet Attariwala
1390 Kenyon St., NW, Apt. 323
Washington, D.C.  20010